

Wilmington Trust Center, 1100 North Market Street, Suite 1001, Wilmington, DE 19801
Tel: (302) 777-5860 ■ Fax: (302) 777-5863 ■ www.WolfBlock.com

Charles M. Oberly III
Direct Dial: (302) 777-6925
Direct Fax: (302) 778-7905
E-mail:    coberly@wolfblock.com

August 8, 2008

The Honorable Sue L. Robinson
United States District Court
844 North King Street
Wilmington, DE 19801

    Re:    U.S. v. James L. Cheeseman
            Cr.A. No. 07-124-SLR

Dear Judge Robinson:

       On behalf of X-Ring Supply and James L. Cheeseman, I am submitting this letter outlining my client's position regarding the government's seizure of over 600 firearms and related items (the "firearms")[1] in August of 2007 following the arrest of Mr. Cheeseman for certain drug offenses. Mr. Cheeseman has since pled guilty to one count of Possession of a Firearm by an Unlawful Drug User or Addict under 18 U.S.C.A. § 922(g)(3). As a result of his arrest, and pursuant to 18 U.S.C.A. § 924(d)(1), the government seized what Mr. Cheeseman contends is over $500,000 worth of firearms and firearm-related items from X-Ring Supply, a sporting good store specializing in firearms and ammunition. Mr. Cheeseman legally owned and operated X-Ring Supply at the time of his arrest. However, at the time of his arrest and for some months before, the day to day operations of the store were carried out by Nancy Macknett (Mr. Cheeseman's sister), Dave Johnson and Robert Henry.

       The facts set forth in the government's memorandum dated August 8, 2008 are not disputed except as noted above and to the extent it is implied that the warehouse was connected to or was part of X-Ring Supply. The warehouse referenced by the government was a separate

---

[1] Despite my attempt to obtain clarity on June 2, 2008, it remains somewhat confusing the number of firearms seized by the government. There apparently exists several compilations that are different insofar as the count of firearms is concerned. The affidavit of Agent Iardella used the figure 704. Count I of the Indictment lists, by my count, 609 firearms. The Asset List for Seizure Notice dated September 19, 2007 lists only 423 firearms having an estimated value of approximately $225,072.00. This list appears to omit nearly 300 firearms from the valuation. The fourth list was also provided to my client and contains a listing of 607 firearms. My client also believes the value of the firearms seized and identified on the Asset List for Forfeiture is understated.

WIL:125648.1/CHE210-831049

Boston, MA ■ Cherry Hill, NJ ■ Harrisburg, PA ■ New York, NY ■ Norristown, PA ■ Philadelphia, PA ■ Roseland, NJ ■ Wilmington, DE
WolfBlock Government Relations - Harrisburg, PA ■ WolfBlock Public Strategies - Boston, MA, New York, NY and Washington, DC
WolfBlock LLP, a Pennsylvania Limited Liability Partnership

The Honorable Sue L. Robinson
August 8, 2008
Page 2

facility that was not connected to X-Ring Supply. There was no common door or other means of ingress or egress. It was located around the corner from X-Ring Supply, approximately 100 feet away. Cheeseman does not contest that various items associated with drug addiction may have been found in the warehouse or possibly outside or inside X-Ring Supply. No firearms were found in the warehouse. Mr. Cheeseman also takes issue with the assertion that his addiction created a substantial risk to public safety. Counsel is unaware of any evidence suggesting that Mr. Cheeseman in any manner endangered the public because he was a cocaine addict.

Based on the facts of this case and the language of the applicable statutes, Section 924(d)(1) does not provide the government with the authority to seize through forfeiture the firearms from X-Ring Supply. As a result, the firearms were illegally and unconstitutionally taken from Mr. Cheeseman and must be returned. Because the firearms are not subject to forfeiture, the Court need not address Mr. Cheeseman's Eight Amendment claims.[2] However, if the Court concludes that the firearms are legally subject to forfeiture, because the forfeiture of over $500,000 worth of firearms and firearm-related items is grossly disproportionate to the crime Mr. Cheeseman pled guilty to, the proposed forfeiture is a violation of the Eighth Amendment of the United States Constitution. Both positions are discussed in detail below.

### A. The Government was not Authorized to Seize the Firearms Pursuant to 18 U.S.C.A. § 924(d) and 18 U.S.C.A. § 922(g)

Mr. Cheeseman pled guilty to one count of violating 18 U.S.C.A. § 922(g)(3), which reads, in pertinent part, as follows:

> It shall be unlawful for any person -- (3) who is an unlawful user of or addicted to any controlled substance (as defined in section 102 of the Controlled Substances Act (21 U.S.C. 802)) ... to ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce.

The government seized over 600 firearms and related items from X-Ring Supply, and pursuant to 18 U.S.C.A. § 924(d)(1), is now incorrectly seeking forfeiture of the same. The pertinent parts of Section 924(d) are as follows:

> (d)(1) Any firearm or ammunition ***involved in or used*** in any ***knowing*** violation of subsection ... (g) ... of section 922 ... shall be subject to seizure and forfeiture
>
> . . . .

---

[2] *United States v. Tedder*, 2003 WL 23204849 at * 6 (W.D. Wis. 2003).

The Honorable Sue L. Robinson
August 8, 2008
Page 3

> (2)(C) ***Only those firearms*** or quantities of ammunition particularly named and individually ***identified as involved in or used in any violation*** of the provisions of this chapter .... shall be subject to seizure, forfeiture, and disposition.

18 U.S.C.A. § 924 (emphasis added).

The plain language in the two statutes does not provide the government an avenue for forfeiture of X-Ring's firearms. Section 924(d)(1) requires the firearms to be "involved in or used" in a "knowing violation" of Section 922(g) for the firearms to be subject to forfeiture. While Mr. Cheeseman was in fact addicted to cocaine at the same time he owned X-Ring Supply, there are no facts to indicate that he "involved or used" the firearms to "knowingly" violate Section 922(g).

*1. "Use" as Applied in Section 924(d)(1)*

First, the Supreme Court of the United States has analyzed the word "use" on three occasions as the word relates to certain forfeitures. In 1993, the Court concluded that when a person trades his firearm for drugs, he is "using" the firearm to traffic drugs.[3] The *Smith* Court defined "use" as "to convert to one's service," "to employ," "to avail oneself of," and "to carry out a purpose or action by means of."[4] In 1995, the Court again analyzed the word "use" under its "ordinary or natural" meaning, concluding "mere possession does not amount to 'use'": § 924(c)(1) requires evidence sufficient to show an active employment of the firearm by the defendant, a use that makes the firearm an operative factor in relation to the predicate offense."[5] In fact, the *Bailey* Court concluded that "[i]f Congress had intended to deprive "use" of its active connotations, it could have simply substituted a more appropriate term- "possession" –to cover the conduct it wished to reach."[6] In December 2007, the United States Supreme Court again addressed the definition of "use."[7] Relying on *Bailey* and *Smith*, the *Watson* Court concluded that a defendant who purchased a gun with narcotics did not use the gun for purposes of an enhanced penalty under Section 924(c)(1). The Watson Court instructed:

> With no statutory definition or definitive clue, the meaning of the verb "uses" has to turn on the language as we normally speak it;

---

[3] *Smith v. United States*, 508 U.S. 223 (1993) (relating to Section 924(c)(1) which establishes a mandatory minimum sentence for a violator who "uses or carries a firearm" in relation to a drug trafficking crime).

[4] *Id.* at 228-229.

[5] *Bailey v. United States*, 516 U.S. 137 (1995).

[6] *Id.* at 148.

[7] *Watson v. United States*, 128 S.Ct. 579 (2007).

The Honorable Sue L. Robinson
August 8, 2008
Page 4

> there is no other source of a reasonable inference about what Congress understood when writing or what its words will bring to the mind of a careful reader. So, in Smith, we looked for "everyday meaning," revealed in phraseology that strikes the ear as "both reasonable and normal."[8]

While the three aforementioned cases do not directly discuss the term "use" within the context of the applicable section here, 924(d)(1), the analysis and the context are very similar. Section 924(c)(1) provides an enhanced penalty for an offender who "uses or carries a firearm" during and in relation to certain criminal acts. In the same way, Section 924(d)(1) provides for the forfeiture of firearms "involved in or used in a knowing violation." Pursuant to the three Supreme Court cases cited above, the word "use" requires an active employment to justify the enhanced penalty of forfeiture of firearms. As emphasized in *Bailey*, "'use' draws meaning from its context and we will look not only to the word itself, but also to the statute and the sentencing scheme, to determine the meaning Congress intended."[9]

On its face, Congress' intent by the word "use" is clear, and when read in conjunction with the *Smith, Bailey* and *Watson* decisions it becomes ever more clear. Just like Section 924(c)(1), Section 924(d)(1) requires more than mere possession for forfeiture. Even if "use" was ambiguous, subsection (d)(2)(C) of Section 924 reiterates that "only those firearms . . . particularly named and individually identified as involved in or used . . . shall be subject to seizure. . . ," again clearly establishing Congress' intent to require more than mere possession for forfeiture to occur.[10]

In this instance, the firearms were not actively used by Mr. Cheeseman to violate the statute, and have not been identified as such pursuant to subsection (d)(2)(C). In the words of the Supreme Court, Mr. Cheeseman did not "employ" the firearms; did not "avail himself of" the firearms and did not "carry out a purpose or action by means of" the firearms in a knowing effort to violate Section 922(g).[11]

Further, analyzing the facts of this case in relation to the facts of *Bailey, Smith* and *Watson*, one can only conclude that the forfeiture proposed is unacceptable. In *Bailey*, the Court concluded that the mere possession of a firearm near the scene of drug trafficking does not

---

[8] *Id.* at 583.

[9] *Bailey*, 116 S.Ct. at 143.

[10] *Id.* at 146. (If there remains any doubt as to what was intended within a clause by reading the clause in isolation, the ambiguity can be resolved through analyzing the remainder of the statute)

[11] See *Smith*, 508 U.S. 223.

The Honorable Sue L. Robinson
August 8, 2008
Page 5

amount to "use."[12] In *Smith*, the Court concluded trading a firearm for drugs was considered a "use" under the statute. In *Watson*, the Court found that receiving a firearm for drugs is not considered a "use" of the firearm. In both *Watson* and *Bailey*, where the Court determined a "use" did not occur, the firearm in question was in close proximity to the criminal behavior, and in one instance was part of the equation, but not enough to be defined a "use." Even when the firearm was a necessary part of the equation, the Court drew a line stating that in the "ordinary meaning and conventions of English," receiving a firearm for drugs could not be a "use." In this case, the firearms in question cannot be said to have been "used" to violate Section 922(g). The government's best case is that the firearms were in the vicinity of Mr. Cheeseman while he used drugs, but only because Mr. Cheeseman was temporarily living on the X-Ring premises. There is not a plausible sentence that could articulate that Mr. Cheeseman used the firearms simply because he happened to be a drug addict while inside of X-Ring Supply. As a result, based on the language of the applicable statute, Mr. Cheesman did not use the firearms to violate Section 922(g) and the firearms are not subject to forfeiture.

### 2. "Involved" as Applied in Section 924(d)(1)

Second, the firearms were not "involved in" a violation by Mr. Cheeseman of Section 922(g). Just like the word "use," the word "involved" is not defined in the statute, and as such, its ordinary meaning must prevail. "Involved" is defined as "to engage as a participant," "to oblige to take part," "to relate closely."[13] "Involved" is defined as "being affected or implicated."[14] In this instance, the firearms were never "engaged as a participant;" were not "obliged to take part;" were not "related closely" (or at all); and were not being "affected or implicated" in any way. In fact, there is no connection whatsoever of the firearms located in X-Ring Supply and Mr. Cheesman's addiction to cocaine.

Mr. Cheeseman is an addict who happened to own a sporting good store specializing in firearms. In fact, just prior to his arrest, Mr. Cheeseman had a failed attempt at rehabilitation. Mr. Cheeseman was arrested by state authorities outside of a public store with cocaine on his person, and without any firearms in his possession. Mr. Cheeseman did not "use" or "employ" any of the firearms from X-Ring Supply to in anyway assist with his addiction. With absolutely no connection between Mr. Cheeseman's addiction and the firearms, the firearms are beyond the government's forfeiture grasp, and it is fundamentally unfair to allow the firearms to be forfeited. It is interesting to note that the United States was not even involved in this case at the time of arrest, and presumably only made this into a federal case once it determined Mr. Cheeseman owned a gun shop and it could try and seize the entire inventory.

---

[12] *Bailey*, 128 S.Ct. at 581.

[13] *See* Merriam Webster's Collegiate Dictionary, Tenth Edition (1994) at 617.

[14] *Id.*

The Honorable Sue L. Robinson
August 8, 2008
Page 6

      The government cites to an Eastern District of Kentucky case that concluded that an individual need only be in possession of a firearm as an unlawful user.[15] Of course, this Court is not required to follow the Kentucky court's lead, but even if it were so inclined, the Kentucky case is fundamentally different than Mr. Cheeseman's. Most importantly, in *13 Firearms*, it is unclear whether the 13 firearms found in the defendant's home were legally owned. The intent of the statute was no doubt to remove firearms used by dealers and addicts on the street. In this case, Mr. Cheeseman held a Federal Firearms License, operated a legitimate and legal business, and lawfully possessed the firearms seized for business purposes. It is submitted that Section 924(d)(1) was never intended to encompass the massive forfeiture of firearms from a legitimate business merely because the owner had a drug addiction.

      *3. "Knowingly" is a Required Element for Forfeiture under Section 924(d)(1)*

      Most notably, the statute requires a knowing violation of Section 922(g) before forfeiture can occur.[16] This added element has yet to be established by the government. While Mr. Cheeseman admits to violating Section 922(g) for purposes of his Plea Agreement, Mr. Cheeseman's plea agreement does not provide an admission of "knowingly" violating Section 922(g) for purposes of forfeiture. In other words, Mr. Cheeseman has not knowingly involved any firearms in his drug use. This additional element is required for the firearms to be forfeited, especially in instances, such as this, where the forfeiture is a punishment.

      The government acknowledges that it bears the burden of establishing the forfeitability of the firearms in question by a preponderance of the evidence.[17] As discussed in more detail below, a forfeiture that imposes "payment to a sovereign as punishment for some offense," is considered a punishment, not solely a remedial measure.[18] Further, the Third Circuit has concluded that "forfeiture is a form of sentence enhancement that follows a previous finding of

---

[15] *United States v. 13 Firearms*, 2006 WL 1913360 (E.D.Ky.).

[16] *United States v. Heitzman*, 886 F.Supp. 737, 739 (E.D.Wa. 1994) ("*Compare* 18 U.S.C. § 924(d)(1) (requiring a demonstration of **knowing** statutory violation in order to be subject to forfeiture, and providing for return of the seized firearms upon acquittal of or dismissal of charges against he firearm's owner or possessor) with 18 U.S.C. § 918(a)(2) (excepting from forfeiture property used by owners or lienholders without their knowledge or consent)...").

[17] *United States v. Voigt*, 89 F.3d 1050, 1083 (3d Cir. 1996).

[18] *Austin v. U.S.*, 509 U.S. 602, 622 (1993).

The Honorable Sue L. Robinson
August 8, 2008
Page 7

personal guilt."[19] In this instance, the forfeiture of an approximate $500,000 worth of firearms is in fact an enhanced punishment and should be evaluated accordingly.[20]

### B. Eighth Amendment Violation

Should the Court conclude that, in fact, the government has a right to forfeiture of the firearms, in this instance, the seizure violates Mr. Cheeseman's Eighth Amendment rights. Forfeiture can be, in part, a form of punishment. In fact, "[t]he 'forfeiture of property ... [is] a penalty that ha[s] absolutely no correlation to any damages sustained by society or to the cost of enforcing the law.'"[21] As a result, the Court placed forfeitures under the confines of the Eighth Amendment's Excessive Fines Clause and subject to the restraint of proportionality. In doing so, "[t]he amount of the forfeiture must bear some relationship to the gravity of the offense that it is designed to punish."[22] Thus, a forfeiture which is "grossly disproportional to the gravity of the defendant's offense" violates the Eighth Amendment.[23]

Further, if a statute mandates 100% forfeiture, the defendant must first establish a *prima facie* case of gross disproportionality.[24] At that point, if the government fails to show justification for the forfeiture, the court should mitigate the forfeiture with the facts of the case.[25] On the other hand, if the statute indicates that forfeiture is only for certain property, it is the government's burden to establish by a preponderance of the evidence that the property should be forfeited. In this case, Section 924(d) does not provide for 100% forfeiture, thus it is the government's burden to establish that each firearm and related item is rightfully subject to the forfeiture.

In assessing whether forfeiture is grossly disproportionate, the courts have not set forth a test that must be followed, but instead, have indicated factors that can be reviewed under an

---

[19] *Voigt*, 89 F.3d at 1083, citing *United States v. Myers*, 21 F.3d 826, 829 (8th Cir. 1994).

[20] *Heitzman*, 886 F.Supp. at 739 (Congress has tied § 924(d)(1) forfeiture directly to the commission of specified offenses so it is reasonable to presume that the forfeiture is at least partially intended as an additional deterrent to or punishment for those violations of law.).

[21] *Austin*, 509 U.S. at 622, citing *U.S. v. Ward*, 448 U.S. 242 (1980).

[22] *U.S. v. Bajakajian*, 524 U.S. 321, 334 (1998), citing *Austin*, 509 U.S. at 622-3. See also, *U.S. v. Rudaj*, 2006 WL 1876664, at *7 (S.D.N.Y.).

[23] *Id.*

[24] *U.S. v. Sarbello*, 985 F.2d 716, 724 (3d Cir. 1993).

[25] *Id.* ("Such a qualitative adjustment of the punishment to fit the crime comports with, and indeed is compelled by, the operative limiting principle of the eight amendment on the state's power to punish.").

The Honorable Sue L. Robinson
August 8, 2008
Page 8

analysis that "must necessarily accommodate the facts of the case."[26] The Third Circuit has analyzed the U.S. Supreme Court's discussion of proportionality and states that a Court should first turn to the legislature's determination of appropriate punishment, and then assess:

> "(i) the gravity of the offense and the harshness of the penalty; (ii) the sentences imposed on other criminals in the same jurisdiction; and (iii) the sentences imposed for commission of the same crime in other jurisdictions".... in weighing these factors a court should take into account the "absolute magnitude of the crime" and the "culpability of the offender."[27]

For instance, in *Bajakajian*, the Court analyzed the type of crime committed and the harm caused.[28] Bajakajian failed to report a significant amount of currency that he was attempting to export. This caused minor harm to only one party, the government. His failure to report caused no harm to the public or any individual. In light of these facts, the Court concluded that the forfeiture of $357,144 was grossly disproportionate to the crime charged. The Court further noted that this conclusion was made despite the fact that a statute enacted by Congress required full forfeiture.

Similarly this case must be assessed on its facts alone. Prior to his arrest, Mr. Cheeseman legitimately owned and operated X-Ring Supply, a sporting good store specializing in firearms and ammunition. He held a Federal Firearms License (no. 8-51-003-01-8F-33097) for 15 years. In August 2007, Mr. Cheeseman was arrested for certain drug offenses, and ultimately pled guilty to possessing firearms by an unlawful drug user or addict. His arrest resulted in over 600 firearms and additional related items, having a worth somewhat around $500,000, to being confiscated from X-Ring Supply. For the reasons set forth below, it is submitted, the amount of this forfeiture bears no relationship to the gravity of the offense.

First, the Court must look at the legislature's determination of an appropriate punishment for those guilty of being an unlawful drug user in possession of firearms. Pursuant to the statute, plea agreement and presentence investigation report, Mr. Cheeseman can be fined no more than $250,000 for the offense he committed. Thus, the maximum fine is only half of the fine he will have paid if he were required to forfeit all of the firearms and related items seized. It is likely, however, that Mr. Cheeseman would not be fined any sum near the maximum amount of $250,000. It logically follows that a fine of over $500,000 through forfeiture of the firearms is a harsh punishment and grossly disproportionate to the violation to which Mr. Cheeseman is guilty. The government has argued that forfeiture of $500,000 worth of firearms is appropriate,

---

[26] *U.S. v. Premises Known as RR #1, Box 224, Dalton, Scott Township and North Abington Township, Lackawanna County, PA.*, 14 F.3d 864, 875 (3d Cir. 1997).

[27] *Id.*, citing *Solem v. Helm*, 463 U.S. 277 (1983).

[28] *Bajakajian*, 524 U.S. 321.

The Honorable Sue L. Robinson
August 8, 2008
Page 9

relying in part on an Eleventh Circuit opinion, *United States v. Wilton Manors*.[29] However, that defendant's real property was seized due to the fact that he was on that particular property conducting a drug business. In contrast, Mr. Cheeseman never conducted an illegal business, and in fact was a legitimate and licensed firearm dealer. Proportionality is a fact-intensive decision, and the case law provided by the government does not establish that the incredible forfeiture requested by the government would be proportionate in this instance.

Second, the gravity of the offense and the harshness of the penalty are incompatible. This is a victimless crime which encompasses an individual with a drug problem who owned a store which specialized in legal firearms. Mr. Cheeseman did not possess an illegal firearm in an attempt to obtain drugs or conduct a drug deal; he did not have illegal firearms on the street. Mr. Cheeseman owned and operated a legitimate and legal sporting goods store in which legal firearms were bought and sold pursuant to a Federal Firearms License which he held for over 15 years. More importantly, the firearms possessed by Mr. Cheeseman through X-Ring Supply bore no relation to Mr. Cheeseman's drug use or drug possession. It is the government's burden to establish that the firearms are subject to the forfeiture as those "involved in or used in any knowing violation." Unlike in *Yskamp*,[30] relied upon by the government, the firearms are not connected to Mr. Cheeseman's drug use or drug possession. The facts surrounding this case make it clear that the forfeiture of 600 or more firearms and related items, amounting to approximately $500,000, is a grossly disproportionate punishment based on Mr. Cheeseman's culpability and is not justified.

The reality is that this case, but for the fact that Mr. Cheeseman owned and operated a gun shop, would not even be a federal case. The arrest in this case was clearly motivated by a desire to seize the firearms. Typically, a person similarly situated to Mr. Cheeseman would have been prosecuted at the state level and placed in the drug diversion program. In this instance, however, Mr. Cheeseman has been federally prosecuted as an addict of an illegal substance because he owned and operated X-Ring Supply. A federal prosecution, while certainly legally permissible, is atypical for a case of this nature, and as a result, Mr. Cheeseman should not also be subject to a grossly disproportionate punishment of an approximately $500,000 fine through forfeiture.

### C.   X-Ring Supply, LLP

It is not suggested that Mr. Cheeseman, after pleading guilty to a felony, can possess the firearms. He cannot. Mr. Cheeseman will not have a right to or access to the firearms released by the government. On October 1, 2007, Mr. Cheeseman's rights to the firearms, along with any

---

[29] 175 F.3d 1304 (1999). ("If the claimant owns two businesses, and only one is used for criminal purposes, only that business is to be forfeited.").

[30] *Yskamp v. DEA*, 163 F.3d 767 (3d Cir. 1998) (The government confiscated 300kg of cocaine from the forfeited aircraft showing the aircraft was used to traffic cocaine).

The Honorable Sue L. Robinson
August 8, 2008
Page 10

ownership rights to X-Ring, were purchased by his two sisters, Pamela C. Rhoades and Nancy J. Macknett. When the firearms are released by the government, they should become the property of X-Ring, Ms. Macknett and Ms. Rhoades, not Mr. Cheeseman. The two sisters have since procured a Federal Firearms License for X-Ring, and currently own and operate the store. Mr. Cheeseman will have no access or role in X-Ring or the firearms, and this fact should allow for mitigation of the forfeiture.

The government has set forth several cases that it argues show the Court cannot release the firearms to X-Ring Supply, LLP. But each can be distinguished from the case at hand. *United States v. Howell* does not relate to the Eight Amendment, but merely to a Rule 41(e) motion requesting return of the firearm.[31] Similarly, *United States v. Headley* provides that there is a prohibition against allowing a firearm to be held in trust by a third person, but in this instance, Mr. Cheeseman will have no right to ever receive the firearms.[32] There is no trust agreement between Mr. Cheeseman, Nancy Macknett or Pamela Rhoades. Simply put, this case represents a unique set of circumstance with distinctive facts warranting the Court's consideration. It is simply inequitable and unconstitutional to allow forfeiture of such an extraordinary amount of firearms that have not been connected to illegal acts, and that will be the property of X-Ring and its new owners.

"The language of the eight amendment demands that a constitutionally cognizable disproportionality reach such a level of excessiveness that in justice the punishment is more criminal than the crime."[33] If Mr. Cheeseman is required to forfeit $500,000 worth of firearms and related items, this case has reached that level. The magnitude of this crime is slight. A punishment which includes such a fine through forfeiture is a punishment that bears no relationship to the gravity of the offense. Based on the facts and circumstances of this case, and just like in *Bajakajian*, the forfeiture of the $500,000 worth of firearms from X-Ring Supply based on Mr. Cheeseman's guilty plea to one count of possession of firearms and ammunition by an unlawful drug user or addict, a crime, for the worst offenders, worthy of a maximum fine of $250,000, but most likely entailing no fine, is grossly disproportionate, fundamentally unjust and unconstitutional under the Eighth Amendment. It is simply unwarranted to permit the government to destroy a person's life savings because it believes it has the right to do so. Mr. Cheeseman's addiction to cocaine has cost him dearly. He became an addict. He even tried to seek help but was unsuccessful. He has not been accused of selling drugs or guns to others. Simply put, he was at the time of his arrest, a pitiful addict. What sense of justice demands he forfeit his life's savings?

---

[31] *United States v. Howell*, 425 F.3d 971 (2005).

[32] *United States v. Headley*, 2002 WL 31473476 (Ohio).

[33] *Premises Known as RR #1, Box 224, Dalton, Scott Township and North Abington Township, Lackawanna County, PA.*, 14 F.3d at 875, citing *Sarbello*, 985 F.2d 716.

The Honorable Sue L. Robinson
August 8, 2008
Page 11

      As a result, the firearms and related items should be returned to X-Ring Supply, owned and operated by new management. As always, I am available at the convenience of the Court should the Court have any questions.

                                        Respectfully submitted,

                                        Charles M. Oberly III

cc:    Keith M. Rosen, Assistant United States Attorney (via facsimile)
       Martin Durkin, US Probation Officer (via facsimile)
       Joseph Hurley, Esquire (via facsimile)
       Nancy Macknett (via First Class Mail)
       Pamela Rhoades (via First Class Mail)

WIL:125648.1/CHE210-831049