## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

UNITED STATES OF AMERICA,                  :
                                            :
                    Plaintiff,              :
                                            :
          v.                                :          Criminal Action No. 07-124-SLR
                                            :
JAMES L. CHEESEMAN,                         :
                                            :
                    Defendant.              :

### GOVERNMENT'S POST-HEARING MEMORANDUM
### IN SUPPORT OF A PRELIMINARY ORDER OF FORFEITURE

**COMES NOW** the United States of America, by and through its attorneys, Colm F.

Connolly, United States Attorney for the District of Delaware, and Keith M. Rosen, Assistant

United States Attorney, and respectfully submits the following Memorandum in Support of a

Preliminary Order of Forfeiture. For the reasons set forth below, the Court should order the

forfeiture of all the firearms and ammunition specifically identified in Count I of the Indictment.

## I.     INTRODUCTION

From as early as 2003 through his arrest in August 2007, defendant James Cheeseman

was an unlawful user of, and addicted to, cocaine and crack cocaine. His addiction was severe,

as he purchased as much as 10 grams of crack cocaine (the equivalent of 100 "hits") at a given

time. During the same period, the defendant owned and operated a federally licensed gun shop,

X-Ring Supply. He also possessed a personal collection of as many as 68 guns. The evidentiary

hearing in this case conclusively established that the defendant's drug use and his gun shop were

inextricably intertwined. For example:

1

1.    The defendant lied about his cocaine use on his 2005 firearms license renewal application. If he had told the truth, he would not have had a license, and would not have had possession of the store or its inventory. From 2005 until the date of his arrest, therefore, the defendant's license and ownership of the over 600 guns in the store's inventory was *per se* unlawful and based on false pretenses.

2.    The defendant lived in and used cocaine on the premises of X-Ring Supply, in a location where ammunition was kept. There is further circumstantial evidence that the defendant both cooked crack cocaine on the premises and prepared crack cocaine for distribution on the premises.

3.    The defendant compromised the safety of the store and its inventory – by deactivating the alarm and video monitoring systems – so that he and his drug-using companions could be on the premises after hours.

4.    The defendant used the proceeds of guns sales for non-business purposes, presumably to support his drug addiction.

5.    The defendant had access to guns and ammunition while using crack cocaine, and allowed other drug users to have unfettered and occasionally unaccompanied access to the guns and ammunition in the store.

6.    The location of a number of guns purported to be part of the defendant's personal collection cannot be accounted for.

This is not a case where the defendant was a drug addict who just happened to own a gun store. The defendant's use and addiction to crack cocaine infected his ownership of the store and his personal possession of its guns. It created an extremely serious risk to public safety and was a clear violation of the law. All of his personal guns and the store inventory guns were involved in his offense, and their forfeiture is proportionate to the crime. Accordingly, the government respectfully submits that the Court should enter a Preliminary Order of Forfeiture for all the firearms and ammunition identified in Count I of the indictment.

2

## II.    PROPOSED FINDINGS OF FACT

### A.    X-Ring Supply and the Defendant's Personal Gun Collection

During the period alleged in the indictment, X-Ring Supply was a business in Newark,

Delaware, that sold, among other things, firearms and ammunition. (PSR at ¶8).[1] The defendant

was the sole proprietor and owner of X-Ring Supply, and was also the holder of the federal

firearms license ("FFL") for X-Ring.[2] (PSR at ¶¶8, 24). The defendant had owned and operated

the store from its current location in Newark, Delaware since approximately 1994. Id. The store

maintained an inventory of approximately 700 firearms at any given time, all of which were kept

the premises. (PSR at ¶10). The defendant also maintained a personal collection of firearms,

that in August 2007 were kept at the store. Id.

The premises of X-Ring Supply included the retail portion of the gun store itself, with an

adjacent office and bathroom. (Tr. at 20). On the side of the building, accessible from the

outside, was a warehouse, which itself contained a storage area and a small office-type room.

(Tr. at 20). Ammunition was kept in the warehouse, along with gun boxes. (Tr. at 20, 49).

Employees would regularly transit between the store and the warehouse in order to obtain boxes

for the firearms being sold. (Tr. at 49). The warehouse office space had been converted into a

living area, with an air mattress and some blankets. (Tr. at 26).

---

[1]The parties agreed that the facts set forth in the Pre-Sentence Report are part of the record for purposes of the forfeiture determination. See Transcript of August 11, 2008, Evidentiary Hearing [hereinafter "Tr."] at 75-76.

[2]As the holder of a FFL, the defendant could send copies of his license to wholesalers, enabling him personally to order new guns at any time. (Tr. at 18).

3

A federal search warrant was executed at X-Ring Supply on August 14, 2007. The searching agents seized the 607 guns and ammunition that are listed in the indictment. (PSR at ¶24). This includes a quantity of guns that were tagged as belonging to the defendant's personal collection. (Tr. at 32). The government estimates the total value of these weapons to be approximately $371,500.[3] As the sole proprietor of X-Ring Supply and holder of the FFL, the defendant personally owned and possessed this inventory. (PSR at ¶24).

According to an administrative review of the X-Ring records by ATF in January 2007, the defendant had transferred 68 guns from the store inventory to his personal collection. (Tr. at 31-32; GX-11). At the time of the search warrant in August 2007, only 42 of those weapons were found in the store. (Tr. at 33; GX-12, 13). The whereabouts of the remaining 26 guns identified as the defendant's in January 2007 cannot be discerned from his federal acquisition and disposition records, and remain unknown to the government.[4] (Tr. at 33-34).

---

[3]The defendant estimates the value of the property to be closer to $500,000. The government agrees that the valuation of firearms, like automobiles, is a subjective process that depends upon the condition of the weapon and the market for that weapon. Accordingly, the government agrees that the value of the property ultimately could fall within the range between these two figures.

[4]Based on conversations with counsel subsequent to the evidentiary hearing, the government understands that the defendant will be attaching documents to his post-hearing brief purporting to account for some (but not all) of these missing firearms. The Court should not consider these documents. The defendant was on notice prior to the hearing that the status of these weapons was at issue. See Government's Pre-Hearing Letter at 3-4 n.6. The defendant did not attempt to introduce these documents into evidence at the hearing, and the record is now closed. The government has not seen these documents and has had no opportunity to cross-examine or otherwise challenge this purported evidence.

4

**B.    The Defendant's False Statement About His Cocaine Use to the ATF**

The defendant began using cocaine in or about 2003, and later began smoking crack cocaine. (Tr. at 27). His addiction was substantial, and did not pass notice by customers of the store, or his sister, a part-time employee. (Tr. at 69-70, 89-90). On August 5, 2007, his female companion and co-defendant, Marie "Terri" Henderson, told police that a sizable crack cocaine located in her purse was given to her by the defendant, and that both she and the defendant had used crack cocaine earlier that night. (PSR at ¶17-21). Ms. Henderson further advised that she had been using crack cocaine with the defendant for over one year. (Tr. at 17). The results of expert hair sample analysis confirmed that the defendant has been using cocaine over an extended period of time. (PSR at ¶26).

In order to sell firearms, the defendant was required to maintain a valid FFL, and had to complete the license renewal process every three years. (Tr. at 27). Prior to his arrest in August 2007, the defendant's most recent license renewal application was filed in April 2005. (Tr. at 28; GX-10). If the defendant had not successfully renewed his license at that time, it would have expired in June 2005. Id.

The license renewal application required the defendant to answer a series of questions, and to certify that the answers were true and correct. (GX-10 at 2). The application specifically states that this certification is made "[u]nder penalties imposed by 18 U.S.C. 924." Id. The defendant signed his certification on April 30, 2005. (Id.; Tr. at 29).

Question D-12 on the renewal application states:

12.    Are you an unlawful user of, addicted to [sic], marijuana, or any depressant, stimulant, or narcotic drug, or any other controlled substance?

5

(Tr. at 29; GX-10 at 2). The defendant, despite having been a user of – and being addicted to –

cocaine since 2003, falsely certified that his answer was "No." Id. Had the defendant answered

this question truthfully, his FFL would not have been renewed and he would not have been able

to lawfully sell or possess firearms. (Tr. at 29).

### C.    The Defendant and his Female Companions Reside at, and Use Cocaine on, the Premises of X-Ring Supply

The ATF investigation in this case determined that the defendant was living in the X-

Ring Supply warehouse during the period of his drug addiction. (Tr. at 26-27). This was

confirmed by various X-Ring Supply employees, who were aware that the defendant was living

in the store two to four nights per week (sometimes more) during 2005-2007, and perhaps before.

(Tr. at 46, 64, 68-69, 73). The defendant was also sleeping in the store area itself, confirmed by

the presence of a sleeping bag in the main office. (Tr. at 47, 74). He was also found asleep in the

store on multiple mornings. (Tr. at 69, 74).

Also living out of X-Ring Supply at various times (starting in at least 2005) was Charlotte

Key, the defendant's companion. (Tr. at 27, 47, 60, 68, 93). Ms. Key was also a user of crack

cocaine. (Tr. at 27). Although not an employee, Ms. Key was observed by X-Ring staff in the

store before the store opened various mornings. (Tr. at 47, 60). Further, she personally had

possession of keys for the warehouse locks after those locks were changed. (Tr. at 63). Marie

"Terri" Henderson, another of the defendant's drug-addicted companions, was also found by

employees in the store in the mornings before the store opened. (Tr. at 60).

A total of three crack pipes were found by employees on the premises of the store. (Tr. at

39). Employee David Johnson found one pipe in the parking lot, and, in January 2007, a second

on top of his desk in the main store area, adjacent to the firearms and the cash register. (Tr. at 61-62). Charlotte Key was present in the store on the morning when Mr. Johnson found the crack pipe on his desk. (Tr. at 62). Thereafter, the defendant denied that it was his. (Tr. at 62-63).[5]

A review of the financial records for X-Ring Supply for 2006-2007 revealed that the defendant was making a large volume of cash withdrawals from the business account, with no business purpose. (Tr. at 36-38; GX-14).[6] In sum, the defendant was making as many as four to five ATM withdrawals per day, with some amount of cash being withdrawn virtually every day, totaling between $12,000 to $17,000 in cash per month. (Tr. at 37-38; GX-14). This pattern caused concern for Nancy Macknett, the defendant's sister, who was responsible for the store's books. (Tr. at 88). The most reasonable inference to draw is that the defendant was using these funds to support his heavy cocaine addiction. (Tr. at 44).

### D.    The Defendant Directly Compromised the Security of X-Ring and Its Inventory

The defendant directly compromised the security of the firearms at X-Ring Supply by (a) personally using crack cocaine on the premises; and (b) allowing his drug-using companions to be on the premises after hours. To accomplish this, he created a further risk that the firearms could be stolen or misused by deactivating the security systems for the store.

---

[5]It is notable that the defendant was not himself present in the store at the time when the crack pipe was found – suggesting that he let Ms. Key stay in the store, with the guns, by herself while she was using crack cocaine. (Tr. at 65).

[6]The business operated through a single checking account in the name of the defendant. (Tr. at 36). The defendant maintained a debit card on the account. (Tr. at 36).

The security of the X-Ring firearm inventory was based on two systems: a nighttime alarm, and a 24-hour continuous video recorder. (Tr. at 48-49, 54). The video system was designed to stay on at all times, whether employees were present or not. (Tr. at 54). The cameras used for the video system were positioned in various parts of the store; they were not positioned in the warehouse area, however. (Tr. at 48-49, 59). The system was designed to record both day and night, and employees were responsible for ensuring at the end of each day to set the tape for nighttime recording. (Tr. at 50).

On a number of occasions, X-Ring employees would find that the video system had been shut down during the evening. (Tr. at 50-51, 59). This was not due to an equipment malfunction, but rather a deliberate decision to turn off the cameras and the tape. (Tr. at 50-51). Indeed, the defendant admitted to one of his employees that he personally had turned the system off. (Tr. at 59). Yet, there was no safety or business reason to turn off the video system, as doing so directly compromised the safety of the store. (Tr. at 50, 55, 59). Thus, it is fair to conclude that the defendant turned the system off because otherwise his actions in the main part of the store, where the guns were kept would have been recorded. (Tr. at 55).[7] Indeed, considering the discovery of a crack pipe by David Johnson in the main store area, it is reasonable to conclude that the defendant or one of his companions was using crack cocaine in the same location as all the firearms in inventory.

The defendant also frequently directed his employees not to turn on the night alarm at the end of the day. (Tr. at 51, 60). There was no reason to turn it off, other than the defendant

---

[7]As noted, there were no cameras in the warehouse area. If the defendant was merely living (or doing drugs) in that part of the premises, there would have been no need for him to deactivate the video system. The defendant has offered no explanation for this behavior.

8

planned to be in the store after hours. (Tr. at 52, 54, 60-61). In addition, on more than one occasion, the defendant directed employees not to turn on the alarm because Ms. Key (his cocaine-using companion) would be present in the store after hours. (Tr. at 61).

> **E.    The Defendant is Arrested in Possession of 100 Doses of Crack Cocaine on August 5, 2007 – One Week After Moving His Personal Gun Collection**

Prior to the end of July 2007, the defendant kept his personal firearms at the home of his ex-wife, Patsy Cheeseman. (Tr. at 34-35). During the summer of 2007, Patsy Cheeseman insisted that the defendant remove his weapons from her home, which he did on or about July 29, 2007. (Tr. at 35-36, 70-71). The defendant took some portion of those weapons to X-Ring Supply, where they were kept loose, unlocked, on top of a filing cabinet in a bathroom – adjacent to the office where the defendant would sometimes reside. (Tr. at 91-92).[8]

One week later, on August 5, 2007, at approximately 11:15 pm, Delaware State Police officers arrested the defendant and his female companion (Marie Henderson, a/k/a "Terri") in the parking lot of an Eckerd's store in New Castle County after normal business hours. (PSR at ¶¶11-16). Within Henderson's purse, was a clear knotted bag containing crack cocaine, a loose rock of crack cocaine, and a crack pipe. (PSR at ¶13). A subsequent search of the defendant's person uncovered in his shirt pocket a box of cigarettes containing three clear plastic bags, inside of which was a quantity of crack cocaine, as well as a crack pipe which was burnt at one end, suggesting that it had been used. (PSR at ¶¶14-15). An additional crack pipe was found on the

---

[8]It is disturbing that the defendant's sister, who ostensibly was helping to manage the day to day affairs of the store (and who is the proposed recipient of the guns if not forfeited) apparently took no action to secure or inquire into a cache of weapons lying loose in the store's bathroom. It is particularly disturbing since Ms. Macknett knew by this time that the defendant was a drug addict, had confronted him about that fact, and had arranged for him to go to rehab. (Tr. at 79, 89-92).

center console of the vehicle. (PSR at ¶15). The officer weighed the drugs and determined that

the defendant was in possession of approximately 10.5 grams of crack cocaine, and that

Henderson was in possession of approximately 4.2 grams of crack cocaine.[9] (PSR at ¶16).

The search warrant on August 14, 2007, confirmed that the defendant was still actively

using, cooking, and distributing, cocaine on the premises of X-Ring Supply. In the warehouse

office area/living space, agents found the following:

   (a)    a used crack pipe, hidden inside an empty box of garbage bags (Tr. at 22;

          GX-2, 3.);

   (b)    a mirror with cocaine residue (Tr. at 23; GX-4);

   (c)    a burnt spoon with cutting agent residue (Tr. at 24-25, GX-7);

   (d)    a "push rod" for filling a crack pipe (Tr. at 25; GX-8);

   (e)    an ash tray containing white residue next to numerous rounds of

          ammunition (Tr. at 26; GX-9); and

   (e)    a digital scale, with white residue on its face, hidden inside a VCR. (Tr. at

          23-24; GX-5, 6.).

A digital scale is commonly used to weigh drugs for distribution; cocaine users typically

do not have a need for a scale, nor would a gun shop have any need for such a scale. (Tr. at 24).

Moreover, the "cutting agent" found on the burnt spoon is a substance used to increase the

volume of a quantity of cocaine for purposes of distribution. (Tr. at 25). Additionally, agents

also found a butane torch in the warehouse, which suggests that the defendant was "cooking" the

---

[9]The standard user dose of crack cocaine is only approximately one-tenth of a gram. (Tr.
at 16, 40).

crack cocaine on site. (Tr. at 25-26). The presence of these items strongly suggests that the defendant was not only using crack cocaine on the premises of the gun shop, but was also preparing crack cocaine for distribution there.

## III.    CONCLUSIONS OF LAW

The Court's analysis of the forfeiture in this case should proceed in two steps. First, the Court should determine whether the property identified in Count I of the indictment is subject to forfeiture under Title 18, United States Code, Section 924(d)(1). If so, then the Court should consider the defendant's claim that the forfeiture would violate the Excessive Fines Clause of the Eighth Amendment. For the reasons set forth below, all the property is forfeitable under section 924(d), and such forfeiture is constitutional.

### A.    All the Firearms are Subject to Forfeiture Under Section 924(d)(1)

The defendant has pled guilty to Count I of the indictment, charging him with possession of firearms and ammunition by an unlawful drug user or addict, 18 U.S.C. §§ 922(g)(3), 924(a)(2). Count I of the indictment specifically lists 609 firearms, as well as a quantity of ammunition, as being involved in that offense. As part of his plea agreement, which this Court previously accepted, the defendant admitted that, from on or about August 5, 2007, through August 14, 2007: (a) he actually and constructively possessed the firearms and ammunition set forth in Count I of the indictment; (b) he was a regular unlawful user of, and addicted to, cocaine base; and (c) the firearms and ammunition at issue affected interstate commerce. See Memorandum of Plea Agreement at ¶3.

11

It is the government's burden to establish forfeitabililty in this instance by a preponderance of the evidence.[10]   The defendant has admitted − and the facts admitted in his plea agreement and adduced at the evidentiary hearing confirmed  − that all of the firearms and ammunition specifically identified in Count I of the indictment were possessed by the defendant in violation of 18 U.S.C. § 922(g)(3).  As a result, all of these weapons are forfeitable under the express terms of the applicable forfeiture statute, 18 U.S.C. § 924(d)(1).  The defendant's arguments to the contrary are lacking in merit.

Section 924(d)(1) provides, in relevant part:

> Any firearm or ammunition involved in or used in any knowing violation of subsection . . . (g) . . . of section 922 . . . shall be subject to seizure and forfeiture.

18 U.S.C. §924(d)(1).  By the plain and unequivocal language of this statute, any firearm or ammunition that is "involved" in a section 922(g) offense is forfeitable.  Since section 922(g) offenses "involve" the possession of firearms/ammunition by a prohibited person, the firearms that were illegally possessed by definition must be "involved in" the offense.  See United States v. 13 Firearms and Ammunition, 2006 WL 1913360 at *2 (E.D. Ky. July 11, 2006) (unreported decision) (in 922(g)(3) case, government need only prove that drug addict defendant possessed the weapons at issue for those weapons to be forfeitable).

The applicability of section 924(d) in this case is plain.  All of the firearms at issue were identified as part of the offense alleged in Count I of the indictment, and the defendant admitted possessing all of these weapons in paragraph 3 of his plea agreement.  It would strain credulity to suggest that a firearm that is specifically charged in the count of conviction is not "involved in"

---

[10]See generally United States v. Voigt, 89 F.3d 1050, 1083 (3d Cir. 1996); United States v. Pellulo, 14 F.3d 881, 901-06 (3d Cir. 1996).

the offense. Moreover, the factual record set forth in the PSR and at the evidentiary hearing establishes that the defendant both owned and possessed all the firearms and ammunition seized from X-Ring Supply in August 2007. Accordingly, all these firearms were "involved in" the offense and are forfeitable.

Forfeiture under 18 U.S.C. § 924(d) also requires that the firearms are involved in a "knowing" violation, in this case of 18 U.S.C. § 922 (g)(3). As section 922(g) requires that the defendant act knowingly as an element of the offense, and the defendant has pled to that offense, this requirement is clearly satisfied. See United States v. Dodd, 225 F. 3d. 340, 344 (3d Cir. 2000).

**B.     The Defendant's Arguments Regarding Forfeitability are Meritless**

Despite the plain language of the statute, the defendant has contended in his pre-hearing memorandum that the firearms specifically charged in Count and admitted his plea agreement are somehow not within the ambit of section 924(d)(1). These arguments fail both legally and factually.

**1.     "Involved in"**

The defendant claims that the "involved in" clause of section 924(d)(1) requires more than mere possession, though he does not articulate what further conduct should be required. That is, he claims that even if a defendant illegally possesses a firearm, more is necessary before that same firearm should be considered "involved in" the offense for purposes of forfeiture. This argument strains logic. The firearms that are illegally possessed are the corpus of a section 922(g) offense, much like laundered money is the corpus of a money laundering offense and controlled substances are the corpus of a controlled substance offense. If the corpus of the

13

offense is not "involved in" the offense, then there is no offense. The defendant's argument simply makes no sense.[11]

Moreover, the "involved in" clause appears in numerous other forfeiture provisions, and the defendant's construction has been rejected by Courts in those contexts. The money laundering forfeiture statute, 18 U.S.C. § 982(a)(1), for example, mandates the forfeiture of "any property, real or personal, <u>involved in</u> such offense" (emphasis added). Contrary to the defendant's suggestion that "involved in" is a narrower category than the corpus of the offense, courts construing this language have repeatedly held that "involved in" refers to more than the actual money laundered. <u>See, e.g.</u>, <u>United States v. Huber</u>, 404 F.3d 1047, 1056 (8th Cir. 2005); <u>United States v. Puche</u>, 350 F.3d 1137 (11th Cir. 2003); <u>United States v. McGauley</u>, 279 F.3d 62, 76 n.14 (1st Cir. 2002); <u>United States v. Baker</u>, 227 F.3d 955 (7th Cir. 2000); <u>see also</u> <u>United States v. Reiner</u>, 397 F. Supp. 2d 101, 111-12 (D.Me. 2005) (collecting cases); <u>United States v. Schlesinger</u>, 396 F. Supp. 2d 267, 272 (E.D.N.Y. 2005) (same). As the <u>McGauley</u> and <u>Reiner</u> courts recited, Congress specifically used the "involved in" language in section 982 to denote a scope broader than the funds actually laundered as part of the underlying offense. <u>See</u> <u>McGauley</u>, 279 F.3d at 76 n.14; <u>Reiner</u>, 397 F. Supp. 2d at 112. This Court should presume that Congress intended the same meaning for "involved in" in section 924(d), and reject the defendant's claim. <u>See also</u> <u>United States v. Elfgeeh</u>, 515 F.3d 100, 139 (2d Cir. 2008), <u>pet. for cert. filed</u> July 9, 2008 (checks deposited into subject account in illegal money remitting scheme

---

[11]The absurdity of the defendant's argument is borne out by his own pre-hearing memorandum, in which he argues that the Court should apply the "ordinary meaning" of the term "involved in" – which he defines as "being affected or implicated." Defendant's Pre-Hearing Letter at 5. If the very guns charged in the indictment are not "implicated" by the defendant's conduct, what are?

"involved in" violation of 18 U.S.C. § 1960(a)); United States v. Nektalov, 461 F.3d 309 (2d Cir.

2006) (ordering forfeiture of $2 million in diamonds "involved in" money laundering offense

despite jury's finding that the value of the laundered property was only $55,200).

Even if this Court accepts the defendant's definition of "involved in," the facts adduced at

the evidentiary hearing proved by a preponderance of the evidence that all of the weapons and

ammunition are forfeitable. The defendant argues in his pre-hearing letter that there was

"absolutely no connection between Mr. Cheeseman's addiction and the firearms." Defendant's

Letter at 6. The facts have shown this claim to be entirely false. As summarized supra, the

defendant's addiction was inextricably intertwined with both his personal gun collection and the

firearms he maintained as inventory at X-Ring Supply. The defendant lived at the store, used

crack cocaine at the store, and lied about his addiction in order to keep his firearms license.[12]

Despite specifically pleading guilty to possessing all 607 weapons illegally, the defendant asserts

in his letter that he "lawfully possessed the firearms seized." See Defendant's Letter at 6. Again,

this is simply false. All the firearms were illegally possessed the moment that the defendant

became an unlawful user of, and addicted to, cocaine. That is the essence of a section 922(g)

offense. See United States v. Dodd, 225 F.3d 340, 344 (3d Cir. 2000) (922(g) violation complete

once prohibited person possesses firearm). Moreover, the defendant lied about his addiction in

2005 in order to renew the very license he used to acquire and possess these weapons. From that

---

[12]The defendant's sister and part-time employee, Nancy Macknett, described the
defendant's presence in the store during business hours as "sporadic." (Tr. at 79). This does not
undermine the connection between the defendant's drug addiction and the firearms, since the
evidence demonstrates that he was using drugs at the store after hours, with full access to all the
weapons. Indeed, Ms. Macknett testified that she decided to confront the defendant about his
drug use after observing his behavior while at the store. (Tr. at 89-90)

time forward, his ownership and operation of X-Ring Supply was illegal, maintained under false

and fraudulent pretenses. Under any standard, the weapons charged in Count I were "involved

in" the defendant's offense.[13]

### 2.    "Used In"

Section 924(d)(1) also renders forfeitable any firearm/ammunition "used in" any knowing

violation of section 922(g). Although the Court need not reach this issue, the firearms and

ammunition identified in Count I also fall within the scope of this clause.

Relying on Smith v. United States, 508 U.S. 223 (1993), the defendant contends that he

did not "employ" the firearms nor "avail himself of" the firearms. Defendant's Letter at 4.

Smith, however, supports the notion that the weapons in the inventory of X-Ring Supply were

"used" by the defendant in committing his section 922(g) offense. In Smith, the Supreme Court

held that trading a firearm for drugs was a "use" of a firearm under 18 U.S.C. § 924(c)(1). In

other words, selling a gun for drugs (instead of money) is a "use" of a gun. In this case, the

defendant – the owner and sole proprietor of X-Ring Supply – regularly sold guns that were all

---

[13]In his letter memorandum, and again at the evidentiary hearing, the defendant repeatedly suggested that the government "only made this into a federal case" so it could "try and seize the entire inventory." See, e.g. Defendant's Letter at 5. The suggestion that the government pursued this case merely to grab the inventory of a gun shop is baseless. Even a cursory review of the facts in this case demonstrates that the government acted because of substantial risk to public safety posed by a crack addict with unfettered access to an arsenal of high-powered weapons and an endless supply of ammunition. The defendant's assertion also ignores:

- the multitude of serious federal narcotics and firearms offenses committed by the defendant – including one carrying a mandatory minimum term of five (5) years imprisonment, see 21 U.S.C. §844;
- the fact that the defendant's arrest revealed that he had lied to the ATF on his FFL renewal application; and
- the fact (well known to defense counsel) that the federal government routinely adopts cases that were initially investigated by state and local law enforcement.

illegally possessed by him.  Each and every gun in the store was bought on the defendant's license, with money from the defendant's bank account, and offered for sale to the public.  Under Smith, therefore, therefore, the defendant "used" each firearm in his inventory.  Even if one accepts the defendant's phraseology, the defendant plainly "employed" and "availed himself of" the firearms by purchasing them, offering them for sale, and using the proceeds to support his crack cocaine addiction.

### C.    Forfeiture of All the Firearms and Ammunition Does Not Violate the Eighth Amendment

The defendant argues that the forfeiture of his firearms, even if authorized under 18 U.S.C. § 924(d), constitutes an excessive fine under the Eighth Amendment and the Supreme Court's decision in United States v. Bajakajian, 524 U.S. 321 (1998).   This argument should fail.

In Bajakajian, the Supreme Court held a forfeiture is a "fine" for purposes of the Eighth Amendment if the forfeiture constitutes punishment for an offense.  524 U.S. at 328.  At the same time, the Court reaffirmed the long-standing principle that a forfeiture statute which is remedial in nature, as opposed to punitive, does not impose a "fine," and therefore is outside the ambit of the Eighth Amendment analysis.  Id. at 329 n.4; see also United States v. Austin, 509 U.S. 602, 622 n.14 (1993).  As the Court explained in Austin, a forfeiture that serves purely remedial purposes cannot be considered constitutionally excessive.  Id.

The Supreme Court held in United States v. One Assortment of 89 Firearms, 465 U.S. 354 (1984), that the forfeiture of firearms under 18 U.S.C. § 924 (d) is a remedial sanction.[14]  In Austin, the Court reaffirmed the validity of 89 Firearms, noting that "we have recognized that the

---

[14]In that case, the Government seized and forfeited the inventory of an unlicensed firearms dealer.

forfeiture of contraband itself may be characterized as remedial because it removes dangerous or illegal items from society." Id. at 621. As a result, the forfeiture in this case cannot be considered constitutionally excessive.[15]

### 1.    The Bajakajian Standard

Even if the Court determines that the forfeiture statute as applied in this case is punitive, the forfeiture of all 607 firearms does not violate the Eighth Amendment. Under Bajakajian, the test is whether the forfeiture is "grossly disproportional to the gravity of the offense." 524 U.S. at 323. To state the inverse, the amount of the forfeiture need only "bear some relation to the gravity of the offense;" the Constitution is only violated if the forfeiture is grossly disproportional. Id. at 334. Strict proportionality between the forfeiture and the offense is not required. Id. at 336. The defendant carries the burden of proving that the forfeiture is grossly disproportional. See United States v. Ahmad, 213 F.3d 805, 808 n.1, 816 (4th Cir. 2000); see also 18 U.S.C. 938(g)(3) (burden in civil forfeiture matter on claimant).[16]

---

[15]The government recognizes that 89 Firearms was a civil *in rem* forfeiture action, and that the Supreme Court has stated in Libretti v. United States, 516 U.S. 29 (1995), that the "fundamental nature of criminal forfeiture" is punishment. As Bajakajian makes clear, however, the mere fact that the government proceeds with a criminal forfeiture as opposed to a civil forfeiture is not dispositive. 524 U.S. at 329 n.4. Although the Government proceeded in this case via a criminal forfeiture count that Congress authorized in the Civil Asset Forfeiture Reform Act of 2000, Pub L. No 106-185, 114 Stat 202, this does not alter the fundamentally remedial nature of Section 924(d). The government is unaware of any federal court relying upon the Eighth Amendment as a basis for overturning a Section 924(d) forfeiture. It is respectfully submitted that this case should not be the first.

[16]During the evidentiary hearing, the Court queried whether it had the ability to mitigate the forfeiture here as an equitable matter. The government respectfully submits that the Court does not have that ability, and that the Court's jurisdiction is limited to deciding (a) whether the firearms are forfeitable under section 924(d), and (b) whether the forfeiture must be limited by the Eighth Amendment.

Importantly, <u>Bajakajian</u> makes clear that whether a forfeiture is constitutionally excessive is determined by comparing the value of the property with the gravity of the offense – and not by comparing the amount of the forfeiture to the owners' personal assets. <u>See</u> 524 U.S. at 323; <u>United States v. 817 N.E. 29th Drive, Wilton Manors, Florida</u>, 175 F.3d 1304, 1311 (11th Cir. 1999). In other words, gross disproportionality is measured against the nature of the offense, not the nature of the offender. <u>Wilton Manors</u>, 175 F.3d at 1311.

Although discussing <u>Bajakajian</u>, the Third Circuit has not articulated a test for determining "gross disproportionality" in its wake. <u>See generally</u> <u>Yskamp v. DEA</u>, 163 F.3d 767 (3d Cir. 1998). The Second Circuit, however, interpreting <u>Bajakajian</u>, has identified four factors that the Court should consider in determining whether a forfeiture is grossly disproportionate:

1.    The essence of the crime and its relation to other criminal activity;

2.    Whether the defendant fits into the class of persons for whom the statute was principally designed;

3.    The maximum sentence and fine that could have been imposed; and

4.    The nature of the harm caused by the defendant's conduct.

<u>Elfgeeh</u>, 515 F.3d at 139. Application of these factors in this case demonstrates that forfeiture of all the firearms and ammunition listed in Count I is constitutional.

**2.    The Forfeiture in this Case is Not Grossly Disproportionate**

The defendant cannot meet his burden of establishing that the forfeiture of his firearms is "grossly disproportionate" to his conviction for illegally possessing those very same guns. To the contrary, forfeiture of all the weapons is directly proportional to the number of guns (and rounds of ammunition) that the defendant possessed illegally, and that he admitted in his Memorandum

19

of Plea Agreement were possessed illegally. If the defendant had only owned one gun, one gun

would have been forfeited. But he did not only own one gun, he owned 607 guns. To accept the

defendant's argument and forfeit fewer than all the guns would be to reward the defendant for

illegally possessing an arsenal of weapons instead of just a single weapon.[17]

### a.    The essence of the crime and its relation to other criminal activity

In that light, this case stands in stark contrast to <u>Bajakajian</u> on the first <u>Elfgeeh</u> prong. In

<u>Bajakajian,</u> the defendant's crime was failing to report over $10,000 in currency that he was

transporting out of the country. 524 U.S. at 324. The government sought the forfeiture of the

entire $357,144 that he failed to declare. <u>Id.</u> Unlike this case, there was no direct correlation

between the amount of money unreported and the elements of the offense; the crime was

committed once the $10,000 threshold was crossed, and the presence of each additional dollar

did not cause a new offense to be committed. In the present case, however, each additional gun

constituted a new offense, as each additional gun was in and of itself illegally possessed.

Moreover, the Court in <u>Bajakajian</u> emphasized that the defendant's crime was solely a

reporting offense; it would have been permissible for the defendant to transport all of the

currency so long as he reported it. <u>Id.</u> at 337. In the present case, the defendant's status as crack

addict made his possession of each of the guns *per se* illegal. Unlike Bajakajian's otherwise

legal currency, the defendant's continued, multi-year addiction rendered each weapon to be

---

[17]It cannot be seriously disputed that forfeiture of the defendant's personal gun collection
is constitutional. Indeed, at the evidentiary hearing, counsel for the defendant conceded as much.
<u>See</u> Tr. at 8 ("[A]t best, there should be no more than a forfeiture of the personal guns . . . ."); Tr.
at 9 ("There's no question that some part of this should be forfeited to the government."").
Accordingly, the government presumes that the defendant is only contesting the forfeiture of the
store inventory under the Eighth Amendment.

contraband. Further, in <u>Bajakajian</u>, the Court expressly found that the defendant's violation of the reporting requirement was not related to any other illegal activities. 524 U.S. at 337-38. Here, by contrast, the defendant's unlawful possession of all the firearms was directly related to his illegal possession of crack cocaine, as well as his distribution of crack cocaine to his female companions who used the drug on the store premises. Indeed, the defendant's possession of the store inventory guns was only possible by virtue of his false statement about his cocaine use on his 2005 FFL renewal application.[18]

The defendant's conduct was related to several additional crimes. The indictment also charged the defendant with possessing over five grams of crack cocaine, 21 U.S.C. § 844, and with distribution of crack cocaine, 21 U.S.C. §841(a)(1) and 841(b)(1)(C). The Government dismissed these charges pursuant to the plea agreement. Further, as noted above, the defendant falsely certified in April 2005 that he was not an unlawful user of or addicted to a controlled substance in his FFL renewal application (Tr. 28-29). By making such a false certification, Mr. Cheeseman committed the offense of making a false statement in violation of 18 U.S.C. § 924(a)(1)(A) and 18 U.S.C. § 1001. Had Mr. Cheeseman been a basically responsible business man with a drug problem (as the defense would like to portray him) the license renewal process should have served as a wake up call for him to remove himself from the business (such as by selling it to a relative) and seek appropriate help. Instead, Mr. Cheeseman committed another federal offense.

---

[18]The defendant asserts in his pre-hearing letter that "[p]rior to his arrest, Mr. Cheeseman legitimately owned and operated X-Ring Supply. . . ." Defendant's Letter at 8. The factual record proves that this is incorrect. The defendant only maintained his license after 2005 based on false pretenses. Moreover, once he became an unlawful cocaine user and addict, he was a prohibited person under the law, and thus could not "legitimately" sell firearms.

**b.    Whether the defendant fits into the class of persons for whom the statute was principally designed**

It is plain that the defendant fits into the class of persons for whom both a conviction under section 922(g)(3) and forfeiture under 924(d)(1) was principally designed. Congress, in passing the Gun Control Act of which section 922(g) is a part, found that the mere possession of firearms by certain classes of people – including drug users and addicts – posed an unacceptable threat to society. In Huddleston v. United States, 415 U.S. 814 (1973), the Supreme Court noted that the legislative history of the Gun Control Act demonstrated that the Gun Control Act was designed to keep "'these lethal weapons out of the hands of criminals, drug addicts, mentally disordered persons, juveniles, and other persons whose possession of them is too high a price in danger to us all to allow'." Id. at 825 (citing 114 Cong. Rec. 13219 (remarks of Senator Tydings)) (emphasis added). In Dickerson v. New Banner Institute, 460 U.S. 103, 112 (1983), the Court stated that in establishing the categories of persons prohibited from possessing firearms "Congress sought to rule broadly - to keep guns out of the hands of those who have demonstrated that they may not be trusted to possess firearms without becoming a threat to society." Id. at 112 (citing Scarborough v. United States, 431 U.S. 563, 572 (1977)).

Section 924, also a part of the Gun Control Act, sets forth a broad range of bases for the forfeiture of firearms. Indeed, beyond expressly providing for forfeiture for weapons involved in violations of the Act itself, section 924(d) broadly authorizes the forfeiture of any firearm or ammunition involved in or used in any willful violation of any other criminal law of the United States. As a result, the predicate violation need not even include as an element the involvement of a firearm for forfeiture of a firearm to be permitted.

In the present case, the defendant was a federally licensed firearms dealer. As such, he was entrusted with a special responsibility to maintain dangerous weapons and ensure that those weapons are handled and sold lawfully. While any person can violate section 922(g)(3), when the defendant is an FFL, Congress' clear intent to separate prohibited persons from firearms is most directly implicated.

In both his pre-hearing letter and at the evidentiary hearing, the defendant argued that the forfeiture of the firearms in this case was not constitutional as it would cause the defendant "to forfeit his life savings." See, e.g., Defendant's Letter at 10; Tr. at 6.[19] This assertion is meritless. The defendant voluntarily sold his entire interest in X-Ring Supply to his sisters in December 2007 for the sum of $150,000. (Tr. at 94-96). The sale included all the defendant's rights in the seized property. Id. Thus, forfeiture of the firearms from the defendant will in actual fact deprive him of nothing, as he has already been compensated for his interest in the property. Moreover, even if the guns were not forfeited, the defendant could not own or possess them because he is now a convicted felon. If the guns were his "life savings," it was he who was the cause of their loss, not the government.

c.    **The maximum sentence and fine that could have been imposed**

On the third prong, if the value of the forfeited property is within the range of fines prescribed by statute for the offense, a strong presumption arises that the forfeiture is constitutional. Wilton Manors, 175 F.3d at 1309-10. At the same time, the fact that a forfeiture exceeds the statutory fine does not mean that the forfeiture is presumptively unconstitutional.

---

[19]The government will assume *arguendo* that the inventory of X-Ring Supply at some prior time represented the defendant's "life savings." However, the defendant introduced no evidence at the hearing to demonstrate that this is, in fact, true.

Id. at 1309 n.9.  Only if the value of the forfeited property is far in excess of the statutory fine

range is the forfeiture likely to violate the Eighth Amendment.  Id.

Instructive on this point is the Fifth Circuit's decision in United States v. Wallace, 389

F.3d 483 (5th Cir. 2004).  In Wallace, the defendant was convicted of operating an unregistered

aircraft.  He was sentenced to one year of probation.  The sentencing judge also ordered forfeiture

of his plane, which the defendant claimed was excessive under Bajakajian.  The Fifth Circuit

upheld the forfeiture, finding that the seizure of a $30,000 airplane was not grossly

disproportionate as compared to the $250,000 maximum fine that could have been imposed for

the offense.  389 F.3d at 486.  Indeed, the court noted that even if the $15,000 maximum fine that

existed under the predecessor statute of conviction had applied, the $30,000 forfeiture would still

not have been grossly disproportionate.  Id.  The court observed that the value of the plane only

differed from the $15,000 maximum fine by a factor of two – whereas the $357,000 forfeiture in

Bajakajian was over seventy times the maximum fine of $5,000 that applied in that case.  Id. at

487.  Moreover, the court found that the defendant had owned the airplane for seven years

without registering it – whereas in Bajakajian, the defendant committed a one-time transportation

of currency offense.  Id.

The seized weapons here are valued at approximately $371,500.  This is only marginally

in excess of the maximum statutory fine of $250,000 applicable to the one count of possession of

a firearm by a prohibited person to which the defendant pled.  Moreover, as the Court is aware,

each individual firearm could have been charged as a separate offense; the entire lot of firearms

was consolidated into one count for purposes of efficiency.[20]  Had the defendant pled to even

three counts of 922(g)(3)– let alone 607 – the maximum statutory fine would have been

$750,000.  This is far in excess of the value of the forfeited property.  Under Wilton Manors,

therefore, since the value of the forfeited property is within the range of fines prescribed by

statute for the offense, a strong presumption arises that the forfeiture is constitutional.  Wilton

Manors, 175 F.3d at 1309-10.[21]

### d.    The nature of the harm caused by the defendant's conduct

The defendant's argument against forfeiture is premised upon the notion that his offense

conduct caused little harm.  He posits that the "magnitude of this crime is slight."  Defendant's

letter at 10.  This claim does not withstand scrutiny.

The assertion that the magnitude of his crime is "slight" grossly understates the

defendant's conduct and the substantial risk to public safety that he caused.  The defendant was a

crack cocaine addict with a sizable drug habit and unfettered access to an unlimited number of

guns.  He was living out of X-Ring Supply, using cocaine on the premises, and allowing his

female companions (who were also drug users) to also live and use cocaine on the premises.  His

cocaine use, cooking, and distribution paraphernalia were secreted in the same area where

ammunition was stored.  He deactivated the security systems for the store, rendering the

inventory vulnerable to robbery.  He transported his personal cache of weapons (including both

---

[20]Pleading to one count (instead of 607) benefitted the defendant as well, as it spared him from having to pay $60,700 in special assessments to the Court.

[21]It is important to note, however, that because the forfeited firearms must be destroyed under the law, thus permanently removing them from the stream of commerce, the Government will not reap any "windfall" or monetary benefit from the forfeiture, whether considered remedial or punitive, or both.  See 26 U.S.C. § 5872 (b); 18 U.S.C. § 924 (d).

handguns and long guns) during the same period of time that he was using upwards of 10 grams of crack cocaine in a single day.

All of this conduct occurred over a period of many years. Much like the defendant in Wallace, the defendant engaged in an ongoing violation of federal law; unlike Bajakajian, this was not a one-time offense. It is hard to envision a more potentially dangerous situation than a long-term crack cocaine addict having a federal firearms license and allowing other addicts unaccompanied access to firearms. In respects both literal and figurative, X-Ring Supply was a time bomb and the defendant was the fuse.

In sum, any Eighth Amendment argument in this case should fail. The defendant's possession of each individual firearm, as well as each unit of ammunition, violated section 922(g), and each item clearly could have been charged and forfeited separately without offending the Constitution. Charging all the items in one count did not make forfeiture of the entire lot more excessive than had they been charged and forfeited one at a time. The fact that the defendant chose to illegally possess an entire store full of weapons, rather than just a few of them, does not make forfeiture of the entire collection an excessive penalty.

### 2. The Court Cannot Order a Sale of the Firearms to Mitigate the Forfeiture, Nor Can it Order Firearms Returned to the Defendant

If the Court determines that forfeiture of the entire lot of firearms and ammunition would violate the Eighth Amendment, then it should mitigate the forfeiture to avoid the constitutional violation. See Von Hofe v. United States, 492 F.3d 175, 191-92 (2d Cir 2007) (remanding to determine extent to which forfeiture of non-innocent spouse's one-half interest in residence must be mitigated). This is not an equitable proceeding, but rather a determination by the Court of

what property can be forfeited within constitutional limits. <u>See</u> <u>United States v. Real Property</u>
<u>Located in El Dorado County</u>, 59 F.3d 974, 986-87 (9th Cir. 1995).

Unlike other types of seized property, by statute federally forfeited firearms and

ammunition may not be sold. Pursuant to Title 18, United States Code, Section 3051(c)(3), and

Title 26, United States Code, Section 5872(b), no forfeited firearms may be sold at public sale.

As a result, the seized firearms in this case cannot be sold by the government in order to create a

pool of monetary proceeds that could be apportioned between the parties, and the Court cannot

order such a sale if it deems mitigation necessary under the Eighth Amendment. If the Court

finds that mitigation is required, it can only order that the government must return whatever

portion of firearms/ammunition is necessary to render the forfeiture constitutional.

Of course, since the defendant is now a convicted felon, 18 U.S.C. § 922(g)(1) prohibits

him from possessing any firearms or ammunition. The Court accordingly cannot return the

weapons to the defendant, as that would implicate the Court in a new violation of section 922(g).

Indeed, Title 18, United States Code, Section 983(a)(1)(F) provides that:

> The Government shall not be required to return contraband or other property that the
> person from whom the property was seized may not legally possess.

Relying upon a combination of statutory law and equitable principles, several courts have refused

to return firearms to convicted felon owners even if the government failed to obtain title to the

property through forfeiture.[22] These courts, following <u>United States v. Felici</u>, 208 F.3d 667, 669-

---

[22]<u>See</u> <u>United States v. Felici</u>, 208 F.3d 667, 669-70 (8th Cir. 2000); <u>United States v.</u>
<u>Howell</u>, 425 F.3d 971, 975-77 (11th Cir. 2005); <u>United States v. Smith</u>, 142 Fed. Appx.100, 102
(3d Cir. 2005); <u>United States v. Harvey</u>, 78 Fed. Appx. 13, 14-15, 2003 WL 21949151 (9th Cir.
2003); <u>United States v. Headley</u>, 50 Fed. Appx. 266, 267, 2002 WL 31473476 (6th Cir. 2002);
<u>see also</u> <u>United States v. Rivas-Cristales</u>, 88 Fed. Appx. 978, 979, 2004 WL 414816 (8th
Cir.2004); <u>United States v. Clenney</u>, 25 F.3d 1041, 1994 WL 233296 (4th Cir. 1994); <u>United</u>

27

70 (8th Cir. 2000), have held that under section 922(g), a convicted felon who is prohibited from possessing firearms simply has no right to their return. A number of these courts have gone further, holding that the defendant may not designate another person to receive the firearms, as that would be a prohibited exercise of constructive possession. See, e.g., United States v. Howell, 425 F.3d 971, 975-77 (11th Cir. 2005); United States v. Headley, 50 Fed. Appx. 266, 267 (6th Cir. 2002).

In this case, the defendant would have the Court direct the government to turn over the seized firearms to his sisters (Nancy Macknett and Pamela Rhodes), who purchased the gun store from the defendant and now operate it as X-Ring Supply LLC. It is not disputed that Ms. Macknett and Rhodes did not have title to the store prior to the seizure in this case, nor is it disputed that they do not have third-party standing to contest the forfeiture. In essence, distribution of the firearms to the defendant's sisters would be a windfall for their business, as they would acquire new inventory at a zero cost basis.[23] Moreover, since the defendant sold his interest in the store and its seized inventory after he was charged and the weapons seized, distribution of the firearms to the sisters would allow the defendant to profit from the sale of weapons that he could not lawfully sell on the open market. Indeed, there is no reason why the defendant's sister, who did not pay for these firearms and who did not take any steps to deny him access to the firearms after she became aware that he was a drug addict, should receive a financial windfall as a result of his long-term felonious conduct.

---

States v. Taylor, 975 F.2d 402 (7th Cir. 1992).

[23]Not surprisingly, it is the sisters' attorney (Mr. Oberly) that is litigating the forfeiture on behalf of the defendant, not the defendant's counsel of record (Mr. Hurley).

Accordingly, if the Court determines that the entire lot of weapons cannot be forfeited, the defendant's proposed plan of distribution should give the Court considerable pause. Absent a more acceptable option, the Court should grant an order pursuant to the All Writs Act permitting the government to destroy any firearms that are not properly forfeited, as they cannot be returned to the defendant. See United States v. Felici, 208 F.3d 667, 670 (8th Cir. 2000); see also United States v. Smith, 142 Fed. Appx. 100 (3d Cir. July 29, 2005) (unreported decision) (following Felici).

## IV.    CONCLUSION

For the reasons set forth above, the government respectfully submits that all the firearms and ammunition identified in Count I of the indictment are forfeitable under section 924(d)(1), and that the forfeiture of those weapons would not violate the Eighth Amendment. Accordingly, the government requests that the Court enter a Preliminary Order of Forfeiture in the form previously submitted.

Respectfully submitted,

COLM F. CONNOLLY
United States Attorney

BY:    _____

Keith M. Rosen
Assistant United States Attorney
Chief, Criminal Division

Dated: August 29, 2008

29

## CERTIFICATE OF SERVICE

I, Theresa A. Jordan, an employee with the United States Attorney's Office, hereby

certify that on August 29, 2008, I electronically filed the foregoing:

### GOVERNMENT'S POST-HEARING MEMORANDUM
### IN SUPPORT OF A PRELIMINARY ORDER OF FORFEITURE

with the Clerk of the Court using the CM/ECF and served counsel of record as follows:

**BY ECF**
Joseph A. Hurley, Esq.
1215 King Street
Wilmington, DE 19801


**BY HAND DELIVERY**
Charles M. Oberly, III, Esq.
Block Wolf LLP
1100 North Market Street, Suite 1001
Wilmington, Delaware 19801


_Theresa A. Jordan_