IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Crim. No. 07-124-SLR |
| | ) | |
| JAMES CHEESEMAN, | ) | |
| | ) | |
| Defendant. | ) | |

---

Keith M. Rosen, Assistant United States Attorney for the District of Delaware, Chief, Criminal Division. Wilmington, Delaware. Counsel for Plaintiff.

Joseph Hurley, Esquire, Wilmington, Delaware. Counsel for Defendant. Charles Oberly, Esquire, Wilmington, Delaware. Counsel for Nancy Macknatt, Pamela Rhoades and X-Ring, Supply, LLC.

---

**MEMORANDUM OPINION**

Dated: January 15, 2009
Wilmington, Delaware

ROBINSON, District Judge

## I. BACKGROUND

On September 13, 2007, a federal grand jury returned a three count indictment with notice of forfeiture charging defendant James Cheeseman with: possession of a firearm by an unlawful drug user or addict, in violation of 18 U.S.C. §§ 922(g)(3) and 924(a)(2) (count one);[1] possession of more than five grams of crack cocaine, in violation of 21 U.S.C. § 844(a) (count two); and (3) distribution of crack cocaine, in violation of 21 U.S.C. § 841 (a)(1) and (b)(1)(C) (count three). (D.I. 13)

Pursuant to a plea agreement, defendant entered a plea of guilty to count one of the indictment on February 21, 2008. (D.I. 27) The plea agreement provided and defendant specifically admitted that,

> if there were a trial, the Government would have to prove three elements of the offense: (1) that from on or about August 5, 2007, through August 14, 2007, the defendant possessed a firearm or ammunition; (2) that the defendant was a regular user of, or addicted to, a controlled substance during a period of time proximate to or contemporaneous with the possession of the firearm or ammunition; and (3) the above-described firearm affected interstate commerce. The defendant knowingly, voluntarily, and intelligently admits for purposes of his guilty plea and sentencing that, from on or about August 5, 2007, through August 14, 2007: (a) he actually and constructively possessed the firearms and ammunition set forth in [count one] of the indictment; (b) he was a regular unlawful user of, and addicted to, cocaine base; and (c) the firearms and ammunition at issue affected interstate commerce.

(*Id.* at ¶¶ 2, 3)

A sentencing hearing was scheduled for June 4, 2008; however, an unopposed motion to continue the sentencing was granted in order to accommodate the parties'

---

[1] Count one alleged that defendant was a prohibited person by virtue of his status as an unlawful drug addict and identified 609 firearms and a quantity of ammunition that defendant possessed.

attempts to "negotiate a settlement of the forfeiture claims."[2] (D.I. 35 at ¶4) After settlement attempts failed, a forfeiture hearing was held on August 11, 2008.[3] (D.I. 41) Post-hearing briefing is complete. (D.I. 43, 44, 45) Before the court are two issues: (1) whether the firearms listed in count one of the indictment are forfeitable under 18 U.S.C. § 924(d); and (2) whether the forfeiture of said firearms would constitute an excessive fine under the Eighth Amendment of the United States Constitution.

## II. FINDINGS OF FACT

1. In August 2007, defendant was the sole proprietor and owner of X-Ring Supply ("X-Ring"), a firearms and ammunition business located in Newark, Delaware. (PSR ¶8) The federal firearms license ("FFL") for X-Ring was held in the name of James L. Cheeseman (defendant). (*Id.*) As a holder of an FFL, defendant could send copies of his license to wholesalers, enabling him to order new guns at any time. (D.I. 46 at 18) At any given time, the store maintained an inventory of approximately 700 firearms, all of which were kept on the X-Ring premises. (PSR ¶10) Defendant also

---

[2] Pursuant to Fed. R. Crim. P. 32.2(b), as soon as practicable after a plea of guilty is accepted, on any count where forfeiture is sought, "the court must determine what property is subject to forfeiture under the applicable statute." Further, "the court's determination may be based on evidence already in the record, including any written plea agreement or, if the forfeiture action is contested, on evidence or information presented by the parties at a hearing after the verdict or finding of guilt." If the court finds the property is forfeitable (government demonstrates a sufficient nexus between the property and the offense), a preliminary order of forfeiture is entered. The preliminary order of forfeiture becomes final at the time of sentencing and must be included in the judgment and conviction order as well as the oral pronouncement of the sentence.

[3] The parties have agreed that there are no objections to the facts set forth in the Pre-Sentence Report ("PSR") and that the PSR may be made part of the record for purposes of the forfeiture determination. (D.I. 46 at 75-76)

maintained a personal collection of firearms that he kept at the premises. (*Id.*) Defendant owned and operated X-Ring, including the sales of firearms and ammunition, from 1994 through August 2007. (D.I. 46 at 17-18)

2. The X-Ring premises included the retail gun store, with an adjacent office and bathroom. (*Id.* at 20) On the side of the retail store building was a warehouse, with a store area and small office-type room. (*Id.*) Ammunition and gun boxes were stored in the warehouse. (*Id.* at 20, 49) Employees regularly entered the warehouse. (*Id.* at 49) The office in the warehouse had been converted into a living area, with an air mattress, sleeping bag and bedding. (*Id.* at 26, 47, 69, 73-74) Defendant was living in the store two to four nights per week, sometimes more, during 2005-2007.[4] (*Id.* at 46, 64, 68-69, 73) On multiple occasions, employees found defendant asleep in the store before morning opening.[5] (*Id.* at 69, 74)

3. X-Ring Supply was equipped with a nighttime security alarm and a 24-hour continuous video recorder. (*Id.* at 48-49, 54) The video system cameras were positioned in the store area, but not in the warehouse area. (*Id.* at 48-49) The video system was supposed to stay on at all times. (*Id.* at 54) At the end of each workday, employees were responsible for setting-up a tape for nighttime recording. (*Id.* at 50) On multiple occasions, employees would find that the video system had been shut down purposefully during the prior evening. (*Id.* at 50-51, 59) One at least one

---

[4]Also living with defendant at X-Ring Supply was Charlotte Key ("Key"), purportedly a crack cocaine user. (D.I. 46 at 27, 47, 60, 68, 93)

[5]Key and another female, Marie Henderson ("Henderson"), were also found by employees in the store on mornings before opening for business. (D.I. 46 at 60)

occasion, defendant told an employee that he had turned the system off. (*Id.* at 59) Frequently, defendant instructed employees not to turn on the night alarm at the end of the day. (*Id.* at 59, 60) On at least one occasion, defendant told employees not to turn on the alarm because Ms. Key would be present in the store after hours. (*Id.* at 61)

    4. Defendant began using cocaine sometime in 2003. (*Id.* at 27) In April 2005, defendant completed a renewal application for his FFL. (*Id.* at 28) In response to a question regarding drug use, (to be answered under penalties imposed by 18 U.S.C. § 924), defendant answered "No".[6] (*Id.* at 29; GX10 at 2) Had defendant responded affirmatively, his FFL would not have been renewed. (D.I. 46 at 29) Sometime in 2005, defendant's sister Nancy Macknatt ("Macknatt") was employed to perform book work at X-Ring. (*Id.* at 77-78) Macknatt obtained power of attorney on behalf of defendant sometime during 2006. She obtained power of attorney because of defendant's various health problems; she was unaware of his drug addiction. (*Id.* at 79) X-Ring operated through a single checking account solely in defendant's name and defendant held a debit card for the account. (*Id.* at 36) During 2006 and 2007, defendant made frequent ATM cash withdrawals from the business account. (*Id.* at 36-38; GX14) Defendant frequently withdrew cash from the ATM.[7] (*Id.* at 37-38; GX14) The frequent withdrawals concerned Macknatt. (*Id.* at 88)

---

[6] Question 12 read: "Are you an unlawful user of, addicted to, marijuana, or any depressant, stimulant, or narcotic drug, or any other controlled substance?" (GX10 at 2)

[7] For example, ATM withdrawal totals for: December 2006 - $12,961.95; January 2007 - $14,398.95; February 2007 - $14,697.50; March 2007 - $15,836.95; April 2007 - $14,793.90; and May 2007 - $17,047.90. (GX14)

5. During July and August of 2007, the day-to-day operations of X-Ring were managed by Macknatt and the store manager, Robert Henry. (*Id.* at 79-80) Defendant's presence at the store was sporadic and unpredictable. (*Id.*) Defendant's employees at X-Ring noticed his drug addition. (*Id.* at 69-70, 89-90) While none of the employees actually saw defendant using drugs, at least three crack pipes were found by the employees on the X-Ring premises. (*Id.* at 39) Defendant entered a rehabilitation center for 10 days sometime in June 2007.

6. In July 2007, defendant removed the personal firearms that he had been storing at the home of his ex-wife, Patsy Cheeseman. (*Id.* at 34-35) He relocated some of the weapons to X-Ring and stored the weapons, loose and unlocked, on top of a filing cabinet next to the bathroom. (*Id.* at 79, 89-92)

7. On August 5, 2007, at approximately 11:15 p.m., Delaware State Police ("DSP") officers observed a vehicle in the parking lot of an Eckerd's store in New Castle County after normal business hours. (PSR ¶11) The vehicle's front doors were open and defendant was observed walking around the vehicle waving his arms, as if involved in a verbal confrontation.

8. At the same time, Henderson was observed walking from behind the business tying her skirt closed. Officers surmised that Henderson had just urinated behind the business. (PSR ¶12) Henderson was taken into custody for lewdness and a search of her person and purse revealed: (1) a clear knotted bag containing crack cocaine hidden inside a box of Winston cigarettes; (2) a crack pipe; and (3) a loose rock of

5

crack cocaine.[8]

9. Defendant consented to a pat down search of his person. (PSR ¶¶14, 15) Officers found a crack pipe in his pocket, which was burnt at one end, suggesting that it had been used. Inside his shirt pocket, officers found a box of cigarettes containing three clear plastic bags, inside of which was a quantity of crack cocaine.[9] A search of the vehicle was conducted at the scene and an additional crack pipe was found on the center console of the vehicle.

10. DSP officers interviewed Henderson at DSP Troop 2 wherein she stated that the crack cocaine located in her purse was given to her by defendant. (PSR ¶¶18-23) She also averred that, shortly before being stopped by police, they met with an individual whom defendant had called for the purpose of obtaining crack cocaine. Henderson explained that defendant gave the drug dealer the money in exchange for the crack cocaine. After obtaining the crack cocaine, they immediately used some of it while seated inside the vehicle. Defendant and Henderson each had their own crack pipes which they used to smoke crack cocaine. Henderson said they had been using crack cocaine together for about a year. Defendant told the officers that he was trying to get help for his addiction and had just returned from a rehabilitation facility.

11. A federal search warrant was executed at X-Ring on August 14, 2007. The searching agents seized approximately 600 guns and ammunition that are listed in the

---

[8]Crack cocaine weighed 4.2 grams. (PSR ¶16)

[9]Crack cocaine weighed 10.5 grams. (PSR ¶16)

indictment.[10] (PSR at ¶24) This includes a number of guns that were tagged as belonging to defendant's personal collection.[11] (D.I. 46 at 32) In a back warehouse room, which appeared to be used as a living space, agents also recovered: (1) a crack pipe, hidden inside an empty box of garbage bags; (2) a mirror with cocaine residue; (3) a burnt spoon with cutting agent residue;[12] (5) an ash tray containing white residue next to numerous rounds of ammunition; (6) a "push rod" for filling a crack pipe; and (7) a digital scale, with white residue, hidden inside a VCR.[13] (D.I. 46 at 22; GX3, GX4, GX5, GX6) A butane torch was also found in the warehouse.[14]

12.  Following his arrest on the charges at bar, defendant provided a hair sample, which was submitted for lab analysis. (PSR ¶26) The results of the test

---

[10]The government estimates the total value of these weapons to be approximately $371,500.00 (D.I. 43 at 4) Defendant estimates the total value as closer to $500,000.00. (*Id.*) Defendant estimates the value of the personal firearms in possession of the government at approximately $67,000.00. Two of the personal collection firearms are, according to defendant, "very rare and valuable" and worth an estimated value of $10,000.00 to $40,000.00 for the Kimber Classic K770 Model K0012 rifle and $15,000.00 to $50,000.00 for the Kimber Classic K770 Model K0005. (D.I. 44 at 5)

[11]A January 2007 compliance inspection conducted by the Bureau of Alcohol, Tobacco, Firearms and Explosives revealed defendant had transferred 68 guns from X-Ring Supply inventory to his personal collection. (D.I. 46 at 31-32; GX11) Only 42 of these guns were found in the store. (D.I. 46 at 33-34) Fourteen of defendant's personal firearms are unaccounted for. (D.I. 45)

[12]A cutting agent is a substance used to increase the volume of a quantity of cocaine for purposes of distribution. (D.I. 46 at 25)

[13]A digital scale is typically used to weigh drugs for distribution; a gun shop would have no need for a digital scale. (D.I. 46 at 24)

[14]Such a torch would have no use in a gun shop; it is typically used to cook crack cocaine. (D.I. 46 at 25-26)

indicated that the sample was positive for both cocaine and cocaine metabolites, indicating that defendant was using cocaine for an extended period of time. (*Id.*)

13. In December 2007, defendant sold the assets of his business to his sisters Pamela Rhoades and Macknett for $150,000.00. (D.I. 39) As part of the agreement, defendant sold all the assets, including "all of the firearms, ammunition, and other business related material now in custody of the Federal government." (D.I. 46 at 94-96) Defendant has no interest in the business, now called X-Ring Supply LCC. (D.I. 44, EX4)

## IV. FORFEITURE

### A. 18 U.S.C. § 924(d)

Since forfeiture is not an element of the underlying crime, the government need only establish its right to forfeiture by a preponderance of the evidence. *United States v. Pellulo*, 14 F.3d 881, 901-06 (3d Cir. 1996). *United Sates v. Voigt*, 89 F. 3d 1050, 1083 (3d Cir. 2003). Because criminal forfeiture is not automatic upon a conviction (in this instance, entry of a plea), the government must establish a sufficient nexus between the offense committed and the property to be forfeited. *United States v. Sokolow*, 91 F.3d 396, 414-15 (3d Cir. 1996).

Forfeiture of firearms involved in a 18 U.S.C. § 922(g) offense is governed by 18 U.S.C. § 924(d)(1), which provides, "[a]ny firearm or ammunition involved in or used in any knowing violation of subsection . . . (g) . . . of section 922 . . . shall be subject to seizure and forfeiture."[15] Defendant argues that there is no evidence that he ever used

---

[15] Any firearms or ammunition deemed forfeitable must be destroyed or disposed of pursuant to 26 U.S.C. § 5872(b).

8

or involved a firearm in any manner to facilitate his cocaine addiction. The court finds, however, that § 924(d) is satisfied by defendant's own admission that, from about August 5, 2007 to August 14, 2007: (1) he actually and constructively possessed the firearms and ammunition set forth in count one of the indictment; (2) he was a regular unlawful user of, and addicted to, cocaine base; and (3) the firearms and ammunition at issue affected interstate commerce. (D.I. 27 ¶3)

Further, it is clear from the evidence and testimony presented at the evidentiary hearing as well as the uncontested PSR that: (1) defendant has been using cocaine since 2003; (2) he was living and using crack cocaine at X-Ring; (3) during after business hours, defendant allowed users of crack cocaine to stay with him at X-Ring; (4) drug paraphernalia was found at X-Ring; (5) defendant lied about his addiction on his FFL renewal; (6) after defendant's FFL was renewed - on false pretenses - he continued to operate X-Ring, including purchasing and selling firearms; (7) he compromised the security of X-Ring by turning off the security alarm in order to allow himself and crack addicts into the retail store; (8) he stored his personal gun collection unsecured; and (9) although not actively involved in the day-to-day business of X-Ring, defendant used drugs on the premises and had unfettered access to the inventory of firearms and ammunition. Accordingly, the firearms and ammunition are forfeitable under § 924.

### B. Eighth Amendment

The United States Supreme Court has concluded that the Eighth Amendment's Excessive Fines Clause is violated if a forfeiture constitutes a "punishment for some offense," but does not "bear some relationship to the gravity of the offense that it is

designed to punish." *United States v. Bajakajian*, 524 U.S. 321, 327 & 334 (1998) (citations omitted). Assessing whether a forfeiture is constitutionally excessive requires a comparison of the value of the property to the gravity of the offense. *Id.* at 323. If, however, the forfeiture is nonpunitive in nature, the Excessive Fines Clause is not implicated. *See Id.* at 329.

Defendant asserts that forfeiture of 600 or more firearms amounting to well over $500,000.00 is a grossly disproportionate punishment and unwarranted by the crime he committed. The court disagrees.[16] By his own admission, defendant possessed all the firearms and ammunition listed in count one of the indictment. Each individual firearm and unit of ammunition could have been charged and forfeited as a separate offense under § 922(g). By consolidating the firearms into one count, defendant avoided exposure to additional special assessments and statutory fines. Consequently, the court finds forfeiture is not so grossly disproportionate as to violate the Eighth Amendment.

## V. CONCLUSION

For the reasons stated, the court finds that all the firearms and ammunition identified in count one of the indictment are forfeitable under § 924(d)(1), and that forfeiture of the weapons does not violate the Eighth Amendment. An appropriate order shall issue.

---

[16]In light of this reasoning, the court will not consider whether certain "valuable" firearms maintained in defendant's personal collection should be treated differently than the other firearms.